[Civ. No. 7613.   Second Appellate District, Division Two.—February 27, 1933.]

GEORGE R. NELSON et al., Respondents, v. WALDEMAR C. WESTERGAARD, Appellant.

W. I. Gilbert for Appellant.

Otto A. Gerth for Respondents.

WORKS, P. J.—This is an action for the recovery of damages for personal injuries suffered by plaintiff Henriette Nelson. It was tried by a jury. Defendants are sued as joint tort-feasors. Judgment went for plaintiffs against defendant Westergaard alone and he appeals.

Mrs. Nelson was riding in a sedan automobile with Westergaard, as his guest. Westergaard was at the steering-wheel and operated the car. Mrs. Nelson sat beside him, while the father of Westergaard occupied the rear seat. The car was proceeding eastward along Wilshire Boulevard in Los Angeles until it reached Highland Avenue, a thoroughfare which intersects Wilshire, at which point occurred the catastrophe out of which the action arises. There is a "jog" in Highland at the place where it intersects Wilshire. Coming into Wilshire from the southward at a certain point, Highland leaves that boulevard on the north at some little distance westward from the location of its southern entry into it. As the Westergaard car neared the intersection from the westward, respondent Dryden approached Wilshire from the southward, also in a sedan car, coming along Highland, his purpose being to enter into Wilshire, make the left turn necessary to enter the northerly prolongation of Highland therefrom, and proceed thence along that thoroughfare. Dryden sat at the driver's seat of his car. His wife was at his right, on the front seat. Senator R. F. Del Valle sat in

the middle of the rear seat. As required by a "boulevard stop" sign at the intersection, Dryden brought his car to a full stop before entering Wilshire. The boulevard appearing sufficiently clear, after a pause of a few seconds Dryden started his car and proceeded into Wilshire, indicating by appropriate signal his intention to make the left turn necessary to carry his machine into the northerly prolongation of Highland. As he progressed, two cars came along Wilshire from the westward and came to a full stop at the intersection, awaiting the completion of his maneuver. One of these stood from four to six feet from the southerly curb of Wilshire, the other at its side and toward the north. Westergaard came up from behind these two cars. For some distance he had been driving at least comparatively close to the southerly curb of Wilshire, but despite the fact that the two cars were at a standstill he made the necessary swerve toward the left to pass them and struck Dryden's car at the second door toward its rear. The impact occurred from six to ten feet southward of the center line of Wilshire, which at that point is in width seventy feet from curb to curb and one hundred feet over all. At the moment of the crash Dryden's car, having just fairly started after its stop at the Wilshire southerly line, was proceeding at the rate of from five to seven miles the hour. There is no substantial dispute in the evidence that for some considerable distance before he reached the intersection and, indeed, up to the very instant when the two cars came together, Westergaard was traveling at the rate of from thirty-five to forty miles per hour.

This assertion requires a particular examination of the facts bearing upon the question, for the reason that Westergaard testified at one place in the record that his car was traveling at a speed of less than ten miles the hour at the moment of impact between the two vehicles, "possibly five or six", and again, "I think it was about five or six". We shall show from the record conditions which demonstrate that these statements are unworthy of belief, but as we cannot charge Westergaard with wilful falsification, we shall first show from his own testimony circumstances which tend somewhat to indicate that his recollection of the events surrounding the catastrophe was extremely clouded, as it well might have been, because of the appalling nature of the

occurrence and because of the shakeup he must have received. That it was appalling we shall show by later statements from the record. First, then, as to Westergaard's state of mind during and immediately after the accident as somewhat indicated by himself. He said: "I was too busy trying to avoid hitting him to pay very much attention to the brakes. I haven't a very definite recollection of it, except that I do know that I applied the foot brakes as I approached; as I saw danger looming up." Dr. Kocher, a wholly disinterested witness, testified at the trial. His testimony is so direct and circumstantial, agrees so thoroughly with that of other witnesses, that he was undoubtedly at the scene. He testified to a conversation he had with Westergaard just following the accident. Westergaard said concerning Kocher: "I am not aware that I made any statement to him. I did not make any statement to him. I have no recollection of ever having seen the man until I saw him here in the courthouse." Mrs. Dryden testified to a conversation with Westergaard. As to this matter the latter said: "She said to me, 'What are you trying to do', or something to that effect. So far as I recall—I do not pretend to recall everything—I said something about going down with my father to the train and I also expressed my regret for what had taken place. I do not recall that I said that I was to blame for the accident; so far as I know, I did not. So far as I know, of my own memory."

We shall now recite the testimony bearing upon occurrences surrounding the catastrophe and shall later describe the state of the two cars after they had collided. Police Officer Slope arrived on the scene soon after the accident. He said: "I asked Mr. Westergaard how fast he was driving. He told me between 35 and 40. That he was going east on Wilshire and came around two cars and saw Mr. Dryden crossing the boulevard. He swerved to the left trying to go to the rear of Mr. Dryden, but Mr. Dryden stopped, he claimed, and he crashed into the rear end. He said he slowed down; I could not find any skid marks, although I looked for them; there were no skid marks. . . . Mr. Westergaard said he was going 35 or 40 miles an hour. I just told him it was kind of fast going down Wilshire at the intersection." The statement of Westergaard to the officer that Dryden stopped his car requires brief attention

before we proceed. That statement and testimony of Westergaard to the same purport comprise the entire showing of the record to that effect. The testimony of other witnesses was that, after leaving the southerly line of Wilshire, Dryden proceeded at a uniform speed of from five to seven miles the hour until his car was struck. Dryden did not see Westergaard's car until it was between ten and fifteen feet away from him. Senator Del Valle first saw it at a distance of about eight feet, and Mrs. Dryden's first view of the car was when "it was right up against us". Officer Slope also testified: "On the pavement there were a couple of brush marks where the car had been pushed a little bit; shove marks. It was the Chandler; Mr. Dryden's car. Those marks were caused from the wheels, where the wheels rest; and the car was pushed, causing a friction on the concrete; that would indicate a side skid. It was not over two or three feet; it was caused by both wheels; front and back; it was to the east. You don't call it skid marks as a rule; we don't call that skid marks as a rule; we call that skid marks where the brakes are applied. A side skid would describe this all right. . . . I could not find a mark on the pavement to show where Dr. Westergaard had slid his car forward an inch. I could not find any indication where he had skidded an inch." Dr. Kocher was driving his car westward on the northerly side of Wilshire at the time of the accident. His vehicle—whether standing or moving the record does not show—was at a point where the east property line of that part of Highland south of Wilshire, if projected, would pass through its location not far from the north curb of Wilshire. In other words, he was diagonally across the intersection, formed by Wilshire and the "jogging" Highland, from the two cars which had stopped at the southwest to allow Dryden to make his left turn and cross. Dr. Kocher testified: "Dr. Westergaard's car hit Mr. Dryden's car on the left, the middle left; that is where he hit the car. It would be the left front of Westergaard's car that hit Dryden's car. After making this stop at Wilshire, Dr. Westergaard's car was moving at a great speed; around 35 to 40 miles an hour. Dryden's car was barely moving. . . . At the time of the impact, the two wheels on the left side of Dryden's car left the ground; the car heads back toward me. If it was pushed on the ground, and how

far, I don't know. . . . I did not see Dr. Westergaard apply his brakes to his car; I couldn't tell any difference as to his slowing up; I couldn't swear to it." Dr. Kocher says he talked with Westergaard: "He said, 'I was in a hurry to catch a train; it was totally my fault.'" The witness said he first saw Westergaard's car when it was 500 feet from the "west curb line of Highland", but a mark he made on a map in the record indicates, according to figures thereon, a distance of not more than one hundred feet. Dr. Kocher went on: "From the time I first saw Dr. Westergaard's car up to the time of the collision, I did not notice any difference in his speed. . . . I observed the Dryden car from the time it entered Wilshire up to the time of the collision. I would approximate his speed at five miles an hour. . . . I saw Westergaard's car go 200 feet while Dryden's car went 35 feet. . . . I did not see any skid marks where this Ford sedan [Westergaard's car] went into the side of the Chandler."

We come now to the testimony of Dryden. He said: "I should judge I was driving from five to seven miles an hour as I started to enter Wilshire boulevard. . . . There was traffic going down the street from the west, and as I gradually pulled out onto the boulevard the traffic came to a stop at the street line of Highland avenue to let me pass. . . . As I started forward there was no cars in front of me going up and down Wilshire boulevard. . . . The cars had stopped on the street line of Highland avenue. Two cars had stopped; they were at my left. . . . I don't think he [Westergaard] was traveling less than 35 miles an hour. At the time I first saw him Mr. Westergaard was in the intersection of Wilshire and Highland." Dryden spoke to Westergaard after the accident: "I asked Mr. Westergaard what he was trying to do. He said, 'I don't know. My, I never have done such a thing in my life before. I know I am to blame. If there is anything to do that I can make it right, I will endeavor to do it.'" The witness further said: "I don't believe that he [Westergaard] applied the brakes to his car that I knew or know of. I didn't hear him. He did not give me any alarm with the horn or sound of his car. . . . As to the time that elapsed between the time that I first saw Dr. Westergaard and the impact,—I saw him and then he hit me; that is all there was to it. At the time he hit me

my speed was just the same as I started out; I had not changed my speed any faster. I was just going the same way. . . . I did not see any [cars] stop except the first two as I was driving out into the street; I saw the first two; that was all it was necessary for me to see. I saw the first two stop and I thought the balance of them would stop.'' Senator Del Valle was a witness at the trial. He said: ''I think Mr. Dryden was driving about six, or seven miles as he proceeded out into the intersection. . . . Before the impact I saw his [Westergaard's] car when it was a very short distance from ours; about eight feet. . . . I have no opinion as to the speed of this car from the time I saw it; I would say it was going very fast, but I could not say as to the number of miles per hour.'' Mrs. Dryden testified that as her husband started to enter Wilshire he ''put his hand out and went along very slowly''. She remarked to Westergaard just after the accident: '' 'What were you trying to do? Look what you have done.' He said, 'I am awfully sorry, lady, but I was trying to catch a train.' '' Mrs. Nelson testified that just before the Westergaard car reached the Wilshire-Highland intersection she had looked at her watch. Then she said: ''There were some cars going ahead of Mr. Westergaard going in the same direction. I know, when I looked at my watch, there were two cars ahead of us. That was the last I remember. . . . I don't know anything about the accident. I looked at the watch and the next thing I know was when I saw Senator Del Valle (I didn't know his name) standing in the road with a bleeding head; that is the next I know. I don't remember anything from the time I looked at the watch until I saw him on the street. It must have been a very short time, of course. When I looked at my watch I know that we were very near the curb, or [sic] near that nobody could come between; and the next I saw him, standing in the road. I don't know anything about how far we were from Highland. We were in the intersection when I saw him standing there. We had not reached the intersection when I looked at my watch.'' And shortly afterward she said: ''I heard Dr. Westergaard make some remarks concerning the accident; I came to, then. He was talking to Mrs. Dryden when I heard him. He said he was awfully sorry; that he was going to make a train

with his father; was going to the train. He was awfully sorry that it happened. That he was going too fast.''

The elder Westergaard, the occupant of the rear seat in his son's car, testified: ''I would say that Mr. Westergaard was driving fast at the time of the collision; middling fast, I guess. . . . By 'middling fast' I mean just the way the crowd goes, generally.'' Westergaard himself, the driver of the car, testified: ''When I got to within 100 feet of the intersection I was driving perhaps 30 to 35 miles an hour; that is my best judgment. There were other machines moving in traffic with me, going in the same direction. So far as I recall, I was following the general speed that obtained along there at that time. As I approached the intersection, I came within perhaps 20 or 30 feet of it, roughly— these figures are bound to be rather rough—because things happened very quickly at a time like that—I noticed a car coming from the right, coming in from the right hand on Highland; coming in on Highland from the right. I started to move to the left and saw that the car continued to move regardless of my turn; and so I swerved in the other direction; and in the meantime we were getting uncomfortably close together, and so I attempted to swerve right, and apparently the other car had either very nearly stopped or stalled, or something, I couldn't quite tell. I was too busy trying to avoid hitting him to be able to say that. And this collision occurred.'' Westergaard testified further: ''I was perhaps ten or twenty feet from Highland when I saw the Dryden car coming into Wilshire. I do recall that I gave my deposition a while ago. I did not say that I was a distance of 100 feet away from the intersection when I first saw the Dryden car; I think I said 50; I said I wasn't sure. It might have been 50 to 100 feet. As I approached Highland avenue I saw the Dryden car just going into the intersection. At that time I was not quite in the intersection and the Dryden car was near the middle line of Highland going into the intersection. At the time I saw this car coming into Wilshire boulevard I was a distance of from 50 to 100 feet away; and that is true, regardless of what I said in the deposition. Then I first swerved to the left and I was afraid I was going to hit him in front, and then I swerved to the right. I finally did hit him toward the rear.'' And again: ''I did not give Mr. Dryden

any warning of a horn, but I did apply the foot brakes. I did not find any skid marks in the wake of my car; the policeman and I looked. I showed the policeman where I came along on the cement street so far as I recall; he asked me about that. We could not find any skid marks.''

We have reserved for separate consideration the matter of the personal injuries suffered by those concerned in the accident, for severe casualties occurred to occupants of both cars. Although Dryden occupied the driver's seat in his car and the vehicle was struck toward the rear, he suffered a fractured rib. Dryden testified, in part, concerning his wife: "Her leg was hurt and skinned a little bit; her stockings tore off. . . . '' Mrs. Dryden said: "The force of the impact threw me out of the door. My side must have hit the handle of the door knob and it threw me out; and the next thing I knew I was down on the street. I was injured.'' Senator Del Valle, it will be remembered, was in the middle of the rear seat of the Dryden car. He testified: "The Dryden car was struck on the back door. I felt the impact, and it sent me against the glass in the back seat, and I broke the glass with my head. The impact was on the right-hand side of the car; I was rendered unconscious at that moment. I don't remember anything at that time. I came to about three-quarters of an hour afterwards.'' Dryden testified: "The impact threw Senator Del Valle's head through the glass in the right hand side of the rear; it cut his head open across the top.'' The elder Westergaard said of his own experience at the moment of the collision: "When this impact took place it broke my glasses and I drove against his seat and so I bruised my arm a little bit; my left arm. After the impact I found myself in front of my son's shoulders in the front seat of the car. He was in his seat, of course. The three of us kept the seats; I was just shoved into the front seat with my arm; I didn't fall down or anything like that.'' This is somewhat difficult to comprehend, but Westergaard the younger testified: "At the time of the impact I found my father huddled up on my shoulders.'' Whether Westergaard himself was physically injured the record does not show. If he was not, he was the only one of the six concerned who escaped. Mrs. Nelson suffered the most severe casualties of all. She, herself, and her physician testified as to the nature of her injuries. Her

left knee was broken and the left leg from knee to hip was badly bruised. The discoloration caused by this bruise lasted "a good many weeks". Her left shoulder was dislocated and she could not move her left arm. She suffered a painful injury to her breast which made it difficult for her to breathe, the pain persisting two or three weeks. Her left wrist was cut and bleeding. "I hurt my right elbow, and there were many weeks before I could ever lift my hand up here; I could not hold anything in that hand." Her right knee was bruised and at the time of the trial it still pained her. Much of her apparel was ruined and her watch was stopped. "I had a big bump on top of my head; I went through the windshield." As a result of her injuries she was confined to her bed for a week or two and was in bed the greater part of the time for five weeks. She found it necessary to use crutches, but began to employ them only after nine weeks. After she discarded the crutches she used a cane. She testified: "I use a cane even up to now; I use it when I go on rough ground." Her physician testified: "The condition of her knee is extremely chronic and may be permanent."

It has already been shown by the testimony of Dr. Kocher and Officer Slope that when the two cars crashed together both the left wheels of Dryden's vehicle rose from the ground and that it was pushed, or made a "side skid" of from two to three feet. This alone is enough to show that Westergaard's car was traveling no mere five or six miles the hour at the time of the collision. But let us see, in addition, what was done to both cars by the impact between them. Dryden testified: "As to my car, the running board on the left hand side was broken; and the fender on the left hand side also; the left rear door was jammed in, and the frame was bent; the rear axle was sprung; and the glass broke out of the window on the right side next to the rear seat. The impact was so hard it cracked the battery." The other car was damaged in a much greater degree, as this testimony of Westergaard will show: "After the impact my car was towed to a garage; it had lost its own running power. As to the damage to the car, the left front end was pretty well jammed up one way or other and the radiator was smashed and jammed in and the front left headlight was broken. I think the bumper was bent and

the body frame was bent also. . . . The entire frame of my car had to be straightened and the bumper had to be straightened and I had to install a new horn as a result of this accident. I had to replace the windshield glass, and I had to replace the left front fender and had to replace the front axle entirely.''

This somewhat exhaustive recitation of the evidence is necessary for the general purposes of the decision, as well as to demonstrate that there is no substantial dispute of the evidence to the effect that at the moment of the collision Westergaard's car was moving at the rate of at least thirty-five miles an hour. It is impossible that a car moving at five or six miles an hour could have wrought the havoc that this engine of destruction did. It is much to be doubted whether Westergaard ever applied his brakes, despite his assertion that he did. It is certain that if he did the application was unsuccessful. It is quite likely, in what was surely a great flurry, a most unnerving moment, that he attempted to apply the brake and missed it. Indeed, any hypothesis is possible rather than the one that he applied the brake with any measure of success whatever. Finally, we conclude that there is nothing in the record which conflicts with the evidence that Westergaard struck the Dryden car while he was running at the same speed his car had maintained for some distance before it reached the intersection of Wilshire and Highland.

It is in effect provided by section 141¾ of what is generally known as the California Vehicle Act that a guest passenger in an automobile, or his heirs, can recover damages from the driver or owner of the car only ''for injury to or death of such guest proximately resulting from the intoxication, willful misconduct, or gross negligence of such'' driver or owner (Stats. 1929, chap. 787). █ It is contended by appellant, because of the language of this enactment, that the evidence was insufficient to support the verdict of the jury and that the trial judge erred in refusing to grant a motion for nonsuit which was presented to him. These points are to be resolved upon the question whether Westergaard was guilty of gross negligence. There is no intoxication in the case and the question of wilful misconduct may be disregarded. One is guilty of gross negligence when he fails to exercise slight care. This statement is so well

settled under all the authorities as to be practically axiomatic. If, then, Westergaard exercised slight care, as shown by evidence undisputed and uncontradicted, the verdict is unsupported and the motion for nonsuit should have been granted. We think, however, there is no substantial evidence of the exercise of slight care in the record, much less a conflict or dispute upon the question. To state it conversely, the evidence of lack of slight care is overwhelming and occupies the field practically by itself. There is no evidence in the record, upon the part of Westergaard, which was worthy of the serious consideration of the jury. The undisputed physical facts of the case meet him at every turn. As we have so thoroughly reviewed the evidence, with a view to the consideration of the two points now under the glass, as we have come to the conclusion already expressed as to the one-sided aspect in which we view the evidence, further discussion of the two points would be useless. Appellant was grossly negligent in the operation of his car at the time when Henriette Nelson was injured.

Appellant complains of various instructions which were given to the jury, because, it is said, the jury was told in them that Westergaard owed to Mrs. Nelson the exercise of ordinary care while she was but a guest passenger in his car. Some parts of the instructions, when severed from the remainder, will undoubtedly bear the construction appellant condemns, but we think the charge as a whole clearly enough informed the jury that the exercise of slight care was all that was necessary, or, conversely, that Mrs. Nelson could recover only if the jury believed Westergaard to have been guilty of gross negligence.

As an instance showing this situation the trial judge gave the following instruction:

"Every person is responsible not only for the results of his wilful act, but also for an injury occasioned to another by the want of his ordinary care or skill in the management of his property or person, except so far as the latter has wilfully, or by want of ordinary care, brought the injury upon himself. The extent of liability in such cases is defined in other instructions.

"With regard to the defendant Waldemar C. Westergaard, and he is the only defendant left in this case as the other defendant is out of the case so far as the jury are

concerned, the general rule of law regulating a failure to exercise ordinary care and its consequence is modified by a legislative enactment requiring not only a showing of want of ordinary care, but either wilful misconduct or gross negligence or both on the part of the defendant Waldemar C. Westergaard, and that the plaintiff's injury and damages proximately resulted therefrom before the plaintiffs can recover. This proposition of law will be more fully defined to you in other instructions.''

Appellant takes exception to the first paragraph of this instruction, but a mere reading of the instruction as a whole serves to convince that the first paragraph was but introductory to the second, and that, taking both paragraphs together, the law was correctly given to the triers of the facts. The use of the phrase ''ordinary care'' in the second paragraph did not, we think, operate to confuse the jury, considering the expressions contained in the latter portion of that paragraph.

Immediately following the instruction just considered the trial judge gave another, which we shall also quote. It is lengthy, but we nevertheless set it down, as it alone practically answers the argument covering many pages of appellant's brief and inveighing against alleged instructions to the effect that Westergaard owed to Mrs. Nelson the exercise of ordinary care. The instruction:

''It is admitted in the pleadings and by the evidence that at the time of the accident referred to in plaintiff's complaint the plaintiff O. Henriette Nelson was a guest passenger in the automobile driven and operated by the defendant Westergaard. As to the liability of the defendant Westergaard to the plaintiffs or either of them, the law is as follows:

'' 'Any person, who as a guest, accepts a ride in any vehicle, moving upon any of the public highways of the state of California, and while so riding as such guest receives or sustains an injury, shall have no right of recovery against the owner or driver or person responsible for the operation of such a vehicle.

'' 'Nothing in this section contained shall be construed as relieving the owner or driver or person responsible for the operation of a vehicle from liability for injury to such guest proximately resulting from the wilful misconduct or gross

negligence of such owner, driver or person responsible for the operation of such vehicle; provided, that in any action for injury or damage to person or property by or on behalf of a guest, the burden shall be upon the plaintiff to establish that such wilful misconduct or gross negligence was the proximate cause of such injury or damage.'

"The legislature of the state of California in 1929 undertook to create a different situation in the matter of negligence between the driver of an automobile who carried a person as his guest, and the driver of other cars. You will understand that a recovery may be had against the drivers of other cars than that in which a guest is riding, by proof of the fact that the drivers of other cars are guilty of negligence, as the same is herein defined to you; but by this act of the legislature, an entirely different situation was created in so far as the driver of a car in which a guest was riding is concerned. The plaintiff can only recover against the defendant Westergaard by proof of the fact that he was either intoxicated or was guilty of wilful misconduct or gross negligence.

"It is alleged in plaintiff's complaint that the defendant Westergaard did operate his car wilfully, recklessly and with an utter disregard of the safety of the plaintiff O. Henriette Nelson, and did operate his car in a grossly careless and negligent manner. The burden of proving this allegation rests upon the plaintiffs, and must be established to your satisfaction by a fair preponderance of all of the evidence, and unless it is so established, or if the proof thereon be evenly balanced, then your verdict will be for the defendant Westergaard."

After quoting these two instructions we think it necessary to say but little more upon the point presented by appellant. The charge, so far as quoted, so clearly and properly stated the law to the jury that it would have required most unusual and impressive language elsewhere in the charge to confuse the jury upon the question as to the degree of care owing by Westergaard to Mrs. Nelson. There is nothing in the instructions as a whole which could have had that effect.

Appellant insists that the trial judge failed to define to the jury the "distinction between ordinary negligence, gross negligence and wilful misconduct". No definition of ordinary negligence was necessary, as the point was not in

the case. This instruction was given: " 'Willful misconduct' would imply a purposeful disregard of the care and diligence which the said defendant owed the said plaintiff." We think this instruction properly defined the term "willful misconduct", the jury having already been instructed as to the degree of care owing from Westergaard to Mrs. Nelson. The following instruction was also given: "The term 'gross negligence' implies the want of slight care; or the exercise of so slight a degree of care as to justify the belief that there was an indifference to the duty owing the plaintiff or her welfare." This instruction contains a fair definition of the term "gross negligence". We think, certainly, that the two definitions, together, taken with the entire charge, were sufficient to inform the jurors as to the distinction between wilful misconduct and gross negligence. We doubt if the distinction could have been better presented to the lay mind than it was on the face of the entire charge.

█ The trial judge gave to the jury several instructions upon the theory that there was evidence from which the jurors could justly have found that the intersection at which the collision between the two cars occurred was in a residential district, as that term is defined in the Motor Vehicle Act. Appellant contends that there was no evidence upon which the jury could have based such a finding. We think there was sufficient evidence to go to the jury on the question. Further, the question whether the intersection was in a residential district was of no real moment in the case. Under the evidence, Westergaard plainly violated the law against driving on a highway at a rate of speed which, "having due regard to the traffic", would not be careful and prudent, and against driving "at such speed as to endanger" life, limb or property (Stats. 1927, p. 1436, sec. 113). He also violated the law against reckless driving on a highway (Stats. 1929, pp. 539, 540, sec. 121). On this latter point, observe, particularly, his own testimony as to the distance from which he first saw Dryden's car, as to his attempt to pass ahead of Dryden, the latter being first in the intersection, and as to his attempt then to turn and pass to Dryden's rear.

█ Appellant requested but the trial judge refused to give the following instruction: "You are instructed that gross negligence and wilful misconduct mean a recklessness

which indicates an utter disregard of the rights of others, and in this case the plaintiffs have alleged that the defendant Westergaard is guilty of such negligence, and the burden of proving that negligence is upon the plaintiffs, and unless they establish the same, by a fair preponderance of all the evidence, or if the evidence thereon be evenly balanced, your verdict will be for the defendant, Westergaard." The refusal was proper. Gross negligence does not indicate "an utter disregard of the rights of others". It indicates something less than a slight regard for their rights—a failure to exercise slight care. The proffered instruction therefore did not state the law.

It is provided by section 4½ of article VI of the Constitution that no judgment shall be set aside in any case because of error unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error has occasioned a miscarriage of justice. Under this rule, even if the trial court had committed the errors charged by appellant, the judgment must be affirmed. We do not perceive how the jury could have done otherwise than render verdict for plaintiffs, whether the trial court erred or not.

Judgment affirmed.

Craig, J., and Archbald, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 27, 1933, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 27, 1933.