[Civ. No. 7805. Second Appellate District, Division Two.—July 14, 1933.]

BARBARA Y. HANDLEY, a Minor, etc., Respondent, v. W. B. RANDOLPH, Appellant.

Hulme, Hastings & Bartlett and James C. Hyne for Appellant.

Robert E. Austin and John N. Helmick for Respondent.

WORKS, P. J.—Respondent is a small child who was injured in an automobile accident. She was traveling in a

car driven by her father, when it collided with one driven by defendant. From the judgment in favor of plaintiff, defendant appeals.

The facts of the case are quite unusual. A caravan of automobiles—so it is called in the briefs—was in procession from Maywood to San Diego, the cars being occupied by members of several branches of a well-known fraternal organization, together with their families. The procession consisted of about 150 cars, with appropriate spaces between them. Mr. Handley was a member of the Maywood branch of the order, which headed the caravan, Handley's car being within a few cars of the head of the procession when it departed from Maywood. The caravan was to proceed through Long Beach, and when the Handley car was within a little less than a mile of the intersection of American Avenue and Wardlow Road, in that city, Handley had some trouble with it and was compelled to pull into the curb on American to rectify the difficulty. In this work he was aided by Officer Nelson of the Maywood police, who, together with other police, was convoying the caravan on its trip. The repairs to Handley's car delayed his party for four or five minutes, during which time the procession moved along American at a speed of from twenty-five to thirty miles an hour. When Handley's car was again in order Nelson stopped that part of the parade which had not yet passed the point at which the repairs were made, allowed Handley to pass through the gap thus made, and attempted, on his motorcycle, to lead Handley ahead to his original place in the procession. During this attempt the motorcycle and Handley's car moved southward along American Avenue, passing the left or easterly side of the cars composing the parade, moving more rapidly than they, and along a line a little to the right of the middle of the avenue. At all times which are of interest here the Handley car was at least from 100 to 150 feet to the rear of the motorcycle, and the two vehicles, according to the variations in the testimony of the many witnesses, proceeded, even up to the moment of the collision hereafter to be described, at a speed of from thirty-five to fifty miles the hour. During this strange race to place Handley in his original location in the line of parade, along an important artery of automobile traffic, Nelson constantly operated the siren on his motorcycle and Handley

blew the horn on his car with less continuity but always, as he says, when he was about to cross street intersections. Randolph, the appellant, was in the meantime approaching American from the westward, along Wardlow and toward the point at which the two thoroughfares intersect at right angles. Wardlow is an unimproved street, and compared to American it is unimportant. At the intersection there is therefore located a "boulevard stop" sign, warning those temporarily to halt who are about to attempt the somewhat perilous passage across American. Randolph obeyed this mandate and stopped his car before it reached the edge of the pavement, which marks the westerly line of American. The procession southerly along the latter thoroughfare was at the moment still in progress, and Randolph waited for some time for an opening in the line of cars. One witness said he waited four or five minutes, but it is hardly conceivable that he could have paused so long for the progress of a caravan, which under the law had no greater rights than he, the mandate of the "stop" sign having been heeded by him, unless the occupation of American by the caravan was such as not to admit of his breaking through. At any rate, Randolph finally saw an opening in the parade sufficient for his needs and moved his car forward. He got through the procession, which was apparently composed of two parallel lines of cars, without mishap, although the driver of the car heading the line next the curb almost ran into Randolph's car for the reason that this driver's brakes, as he testified, were out of order. When Randolph had negotiated the crossing to the extent of getting past the two lines composing the procession and had gotten well into American, he heard Nelson's siren and stopped at once. After Nelson had passed by, Randolph proceeded at a leisurely pace across American, up to the moment when occurred the catastrophe out of which arose respondent's cause of action. Randolph did not hear the sound of a horn from the direction in which Handley was coming, his hearing being good. No witness fixed Randolph's rate of speed as he crossed at more than ten miles the hour, while one witness, at least, placed it as low as four. Handley's car, following the motorcycle at a distance of not less than 100 feet and possibly as great as 150 feet, or even more, collided with Randolph's vehicle in the intersection. At the moment

of the collision Handley was traveling at the rate of not less than thirty-five miles the hour—he himself testified that it was between forty and fifty—and the effect of the impact of the two cars may be imagined. Randolph's car was seriously damaged and was overturned, Randolph himself being badly injured and rendered unconscious, in which state he remained for three or four days. The Handley car proceeded for a distance of about 100 feet after the collision and then toppled over on its side.

There are several other conditions surrounding this accident which must be described in order to understand the conclusion at which we have arrived. It was testified by some witnesses that Randolph, after he had waited until Nelson had passed by, apparently proceeded across the intersection without looking either toward the right or toward the left. This evidence must be taken as supporting the findings of the trial court to the extent covered by it, although Randolph testified to the direct contrary. The circumstance makes no difference, however, in the result. If Randolph had looked north, toward the left, he could have seen nothing more than he swears he did see, that the Handley car was more than 100 feet from the intersection as he started anew to make the crossing. His glance would have shown him, incontestably, that he had the right of way over Handley. He was already well out into the intersection and had stopped because of the mad flight of Nelson, advertised by the shriek of the latter's siren. There was nothing to notify him that Nelson was conducting or leading Handley, although we think that if he had known the circumstance it would make no difference. Randolph was negotiating the intersection from Handley's right, while Handley was approaching it from Randolph's left. There were structures on the northeast and northwest corners of American and Wardlow which "obstructed" the view of the intersection, by both Handley and Randolph, within the meaning of that word as employed in subdivision (b) 2 of section 113 of the California Vehicle Act (Deering's Gen. Laws, 1931, Act 5128). Under the section, a speed of more than fifteen miles the hour in crossing the intersection was therefore unlawful. As we have seen, Randolph proceeded at a much less rate than that, while Handley crossed at a speed nearly, if not more than, three times the allowable rate. Handley

saw Randolph's car standing in the intersection while Randolph awaited the passing of the siren-bearing motorcycle of Nelson, but did not look in that direction again as he approached, and never saw the Randolph car until near the moment of the impact. Handley testified, also: "A. . . . I saw a car [Randolph's] had pulled out through the parade, and had stopped to allow Mr. Nelson to go by, and proceeded to get through Mr. Nelson and myself. Q. All right. About where were you when you first saw that car? A. I was approaching the intersection possibly 150 or 200 feet when I saw the car had stopped there for Mr. Nelson. Q. You saw Mr. Nelson go by? A. I did. Q. Then what did you do? A. I kept going, thinking this gentleman would still be there, taking into consideration I was following behind Mr. Nelson . . . " Meanwhile, Randolph had started, and he proceeded in a right line across the intersection. He never had notice of the oncoming of Handley's car. As already noted, Randolph's car was hurled to the ground, Randolph was thrown out, was rendered unconscious and remained so for a long time. So far as the record discloses, respondent, a minor aged about three and one-half years, was the only occupant of Handley's car who was injured, although four adults were in the machine at the time. The child, as the car sped to the point of impact, was sitting on her mother's lap. Handley testified that, after he saw Randolph's car standing in the intersection awaiting the passage of the fleeting Nelson, he, Handley, never saw it again until it was in front of him near the middle of the intersection. Handley then veered quickly to the left and proceeded thence at such an angle southeasterly that the right rear portion of his car came into violent contact with the left front part of Randolph's vehicle, with the result that both cars were seriously damaged and that, as stated, both plaintiff minor and Randolph were injured. There was possibly sufficient testimony that the collision occurred at about the south middle of the intersection to uphold a finding to that effect, although the bulk of the evidence showed that it occurred in the southeasterly quarter of the intersection.

▮ We cannot but perceive that the negligence of Handley was a contributing cause, if not the sole cause, legally, of the catastrophe. The conduct of Handley was not much,

if at all, different from that of the defendant in the recently decided cause of *Nelson* v. *Westergaard*, 130 Cal. App. 79 [19 Pac. (2d) 867], although in that case the point was not decided whether the intersection in question was a "fifteen-mile" one. Here, however, respondent relies upon the impossible theory that Nelson, on his motorcycle, had the right to lead Handley at a headlong pace through the street intersection along American Avenue, and that Handley had the right to follow his leader. ██ No matter what the rights and duties of Nelson were as he crossed the intersection of American and Wardlow, either as a Maywood police officer acting outside his own territory or even if he had been a Long Beach officer, there is nothing in the law which authorized or permitted Handley to make the crossing at a speed which all the evidence shows he pursued.

Various other points are made, but it is unnecessary to consider them. It is hardly conceivable that upon a new trial the evidence could be so changed as to entitle respondent to recover. We are not, therefore, under the mandate of the law requiring courts of review to decide points likely to arise upon a new trial.

Judgment reversed.

Craig, J., concurred.

Stephens, J., concurred in the judgment.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 11, 1933.